STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
BENJAMIN BOWEN, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted November 7, 1977—Decided December 8, 1977.

Before Judges CONFORD, MICHELS and PRESSLER.

Mr. Thomas J. Shusted, Camden County Prosecutor, attorney for the appellant (Ms. Charlotte K. Gaal, Assistant Prosecutor, on the brief).

Mr. Arthur E. Ballen attorney for the respondent (Arthur E. Ballen & Associates, attorneys).

The opinion of the court was delivered by

PRESSLER, J. A. D. ■ The State, pursuant to .R. 2:3–1 (b)(3), appeals from a judgment of acquittal entered·by the trial court following the jury's return of a verdict finding defendant guilty of a charge of contributing to the de-

linquency of a minor, in contravention of *N. J. S. A.* 2A: 96–4.[1]  We reverse.

The standard to be applied in deciding a motion for judgment of acquittal made under *R.* 3 :18–2 after the discharge of the jury is the same as that applicable to a motion for acquittal made at the close of the State's case or at the conclusion of the entire case. That standard is whether or not the evidence, be it direct or circumstantial, viewed in its entirety and giving the State the benefit of all the evidence favorable to it and all favorable inferences which could be reasonably drawn therefrom, is sufficient to enable a jury to find that defendant is guilty as charged beyond a reasonable doubt. If the evidence meets that standard, then the motion must be denied. *State v. Reyes,* 50 *N. J.* 454, 458–459 (1967); *State v. Rodriguez,* 141 *N. J. Super.* 7, 11 (App. Div. 1976), certif. den. 71 *N. J.* 495 (1976).

All of the evidence here was adduced on the State's case, the defense having rested without coming forward with any proofs at all. According to the State's proofs, viewed in accordance with the acquittal motion test, the complaining witness, a 14-year-old boy, was sitting on a ledge outside a barber shop located in the Cherry Hill Mall late one afternoon waiting for a friend of about the same age who worked in the shop. As he sat there defendant, who was a complete stranger to him, tapped his knee, dropped a note in his lap

---

[1]Although not raised by counsel we note that since the acquittal followed the jury verdict of guilt there is no constitutional impediment to the State's right to appeal. See the September 1977 amendment of *R.* 2 :3–1(b)(3) which, following the holding of *United States v. Martin Linen Supply Co.,* 430 *U. S.* 564, 97 S. Ct. 1349, 51 *L.* Ed. 2d 642 (1977), conditioned the State's right to appeal an n.o.v. acquittal on a jury verdict of guilt having been returned. While *Martin Linen Supply Co.* does not affect the holding of *State v. Kleinwaks,* 68 *N. J.* 328 (1975), it does effectively overrule *State v. Kluber,* 130 *N. J. Super.* 336 (App. Div. 1974), certif. den. 67 *N. J.* 72 (1975), which had sustained the State's right to appeal from an n.o.v. acquittal following the jury's discharge after its announced inability to agree to a verdict.

and proceeded to a corridor a short distance away where there were located public telephones, restrooms and the Mall security officer. The note.read in full as follows:

Dig man. Come over to my pad if you like to drink and play cards, shoot darts and have fun. Just you and I. Some bread too. Ten to fifteen dollars the longer you stay. More fun and more. Come out and rap with me alone about it anyway. You get home okay. Tomorrow alone.

Several minutes later the youngster was joined by his friend to whom he related the episode, telling him further that if he saw the man again he would call the police. The two boys then conceived and executed a plan whereby the boy who had been accosted walked to the corridor with his friend, to whom he had given the note, following behind him. On seeing defendant standing next to a telephone booth, he signalled to his friend, who went into the security office. He himself then continued walking past defendant, who winked at him as he did so. The boy stopped at the water fountain, where defendant joined him and engaged him in conversation in which the boy participated. in order to give the security officer an opportunity to arrive at the scene. The security officer did in fact arrive almost immediately and the entire conversation consisted of defendant asking the boy, "What do you say?", the boy responding, "Where is it at?", and defendant replying, "It's up in Pennsauken. I'll get you home okay." At that point the security officer arrived, placed defendant under arrest and turned him over to the municipal police. Do these proofs and the legitimate inferences to be drawn therefrom permit a jury to conclude, beyond a reasonable doubt, that defendant had wilfully encouraged, caused or contributed to a child's delinquency? We are persuaded that they do.

■ *N. J. S. A.* 2A:96–4 provides in full as follows:

A parent, legal guardian or person having the custody or control of a child, who by any continued negligence or willful act, encourages, causes or contributes to the child's delinquency, or any other

person who by any willful act encourages, causes or contributes to a child's delinquency, is guilty of a misdemeanor.

Our Supreme Court has perceived the essential purposes of the statute to be the protection of "minors from those who would lead them astray" and the prevention of "the exposure of a child to the danger of an immoral life." Distinguishing in that context between the meaning of "encourage" as opposed to "cause and contribute," the court has accordingly defined the substantive offense as encompassing not only conduct resulting in a child's delinquency but also as including conduct having a tendency to cause delinquency whether or not delinquency in fact ensues. *State v. Blount,* 60 *N. J.* 23, 27–28 (1972). And see, *State v. Norflett,* 67 *N. J.* 268, 287–288 (1975). We are, therefore, satisfied that the statute is violated when an adult seriously and purposefully solicits a child to commit immoral acts, whether or not the solicitation results in the actual commission of such acts. We are further satisfied that the State's proofs clearly supported the inference that defendant, beyond a reasonable doubt, had solicited the complaining witness here to commit acts of immorality. It was well within the prerogative of the jury to have concluded from the text of the note, the attendant circumstances and the complaining witness' reactions, that defendant was offering the boy money to engage in homosexual conduct with him. Defendant's implied invitation to the boy to join him in drinking alcoholic beverages and in gambling is equally plain.

The trial judge's reason for granting the acquittal motion was based upon what he regarded as the ambiguous nature of the note. Without referring to the offer of money, which we regard as critical to the inference that the solicitation was not an innocent one, he observed that

* * * the language usage to drink could be construed just as easily to include non-alcoholic as well as alcoholic. To play cards could be construed to include gambling as well as not gambling. Shooting

darts are not inherently evil that I know of and having fun is susceptible of numerous interpretations.

We do not regard those ambiguities, however, as mandating an acquittal on the basis of insufficiency of evidence although they might have justified the factfinder in acquitting on the basis of rejection of the culpable interpretation. The point is that the culpable interpretation constitutes, in our view, not only a fair reading of the note but also the immeasurably more likely one. The substance of an invitation may be explicit and unmistakable, even if the language in which it is couched is not. We are satisfied that the immoral purpose of the solicitation here was so clearly implied and intended by the language used and by the surrounding circumstances as to have required submission to the jury for its determination of the ultimate fact, namely, whether defendant was, beyond a reasonable doubt, encouraging the boy to engage in immoral conduct.

■ Although not raised by either of the parties, there is an additional question raised by our review of the record and particularly the judge's charge to the jury, which we feel constrained to address. At the time of the enactment of *N. J. S. A.* 2A:96-4, the meaning of the word "delinquency" therein contained as the critical element of the definition of the offense, derived its substantive content from *N. J. S. A.* 2A:4-14 and its predecessor legislation. The import thereof was to embrace as delinquent conduct not only those acts which would constitute a crime or *quasi*-crime if committed by an adult, *N. J. S. A.* 2A:4-14(1), but also the whole range of conduct comprehended by the general categories of incorrigibility and immorality, *N. J. S. A.* 2A:4-14(2). That statutory scheme was substantially altered by the adoption of *L.* 1973, *c.* 306, effective March 1, 1974, which, among other provisions, repealed *N. J. S. A.* 2A:4-14 and substituted therefor *N. J. S. A.* 2A:4-44 and 2A:4-45, defining respectively "delinquency" and "juvenile in need of supervision" (J. I. N. S.). Accordingly, delinquent acts under *N. J. S. A.* 2A:4-44 are generally limited to those violative of criminal

or *quasi*-criminal enactments, and the general incorrigibility category of conduct is encompassed by *N. J. S. A.* 2A:4-45. Presently, therefore, and at the time of the commission of the conduct charged by the indictment here, "delinquency" was arguably limited only to that conduct proscribed by *N. J. S. A.* 2A:4-44. The trial judge instructed the jury here that delinquency meant the commission of either an immoral act or an illegal act, and since the jury could have predicated its conviction on the finding of encouragement of immoral acts (*e.g.,* drinking and gambling) in addition to or in lieu of a criminal act (*e.g.,* sodomy), the charge to the jury would have constituted plain error if the "downgrading" of delinquency effected by *N. J. S. A.* 2A:4-45 had the concomitant result of constricting the meaning of "delinquency" as used in the criminal statute, limiting its applicability only to conduct within the ambit of *N. J. S. A.* 2A:4-44 and excluding conduct within the ambit of *N. J. S. A.* 2A:4-45.

This problem was adverted to by the Supreme Court in *State v. Norflett, supra.* There, although the alleged criminal conduct preceded the effective date of *L.* 1973, c. 306, the court noted in footnote 18, 67 *N. J.* at 288, that

At the time that the instant abortion was performed, *N. J. S. A.* 2A:4–14(2) g and m defined juvenile delinquency as "immorality" or "deportment endangering the morals, health or general welfare of said child." Effective March 1, 1974, however, the definition of delinquency was substantially restricted by the enactment of *L.* 1973, c. 306, *N. J. S. A.* 2A:4–44 (Supp. 1975–76).

We are persuaded, however, that this allusion to the problem was not intended to constitute either a consideration thereof or an expression of opinion thereon. We are also persuaded that the Legislature did not by its enactment of *L.* 1973, c. 306 intend to diminish the pre-existing scope of adult conduct interdicted by *N. J. S. A.* 2A:96-4. As we have observed, *N. J. S. A.* 2A:4-44 generally parallels former *N. J. S. A.* 2A:4-14(1)(a) to (d), and *N. J. S. A.* 2A:4-45 parallels former *N. J. S. A.* 2A:4-14(2)(e) to (n). Thus all of the

juvenile conduct originally denominated "delinquency" continues to be a matter of legislative concern and attention. The reason for the bifurcation as between delinquency and "in need of supervision" patently does not lie in a legislative perception that the behavior now encompassed by *N. J. S. A.* 2A:4-45 has become any less inimical to the juvenile's well-being than it formerly was or that a juvenile requires any less protection than formerly from being encouraged to engage in such behavior. Rather the distinction is based on the varying rehabilitative potentials of juveniles whose conduct is primarily anti-social and threatening to the public as compared with those whose conduct is primarily self-destructive. This is clear from the Legislature's own explanation for the creation of the J.I.N.S. category, which is set forth in *N. J.-S. A.* 2A:4-42(b) as follows:

Consistent with the protection of the public interest, to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation.

Thus the legislative focus was not on countenancing behavior theretofore proscribed. Indeed, the behavior subject to J.I.N.S. classification is still referred to in the foregoing statement of purpose as "delinquent acts." The focus is exclusively, in terms of moderated disposition, which for J.I.N.S. conduct is intended to be rehabilitative only and in no degree punitive or deterrent in concept or effect. We do not regard that dispositional concern of the Legislature as constituting an intended or implied redefinition of *N. J.-S. A.* 2A:96-4. The term "delinquency" as used therein continues to mean what it has always meant and that meaning is now supplied by the substance of both *N. J. S. A.* 2A:4-44 and 2A:4-45.

Reversed. The conviction is reinstated and the matter remanded for sentencing.